MILLER, Judge.
This is a Workman’s Compensation suit brought by the plaintiff, Charles Hawkins, Jr., against Frank Mulhearn and his Workman’s Compensation insurer, Aetna Casualty and Surety Company, wherein plaintiff seeks maximum compensation benefits for total and permanent disability for accidental injuries sustained by him on or about July 3, 1967, while in the course and scope of his employment with Frank Mul-hearn. In addition plaintiff prayed for penalties and attorney’s fees for the insurer’s alleged arbitrary and capricious refusal to pay plaintiff’s compensation benefits, and for failure to pay benefits at a correct rate for that period of time when he was admittedly disabled.
The District Court, for written reasons, rendered judgment in favor of plaintiff for compensation at the rate of $28.39 per week beginning July 3, 1967, and extending through February 6, 1968, subject to credit for compensation benefits previously paid. Plaintiff devolutively appealed insofar as he was denied compensation on the basis of permanent, total disability and insofar as the Court rejected his claim for penalties and attorney’s fees.
On July 3, 1967 plaintiff and several other workmen were unloading twelve (12) crated window air-conditioning units from a freight truck and carrying them to a furniture warehouse. The men were working in pairs. Plaintiff and his co-worker, Kenneth Daigrepont, had taken from the back end of the freight truck a crated window air-conditioning unit, weighing approximately 250 pounds, and were in the process of moving from the truck when the load shifted and plaintiff dropped his end. In the process plaintiff fell and struck the right front of his face and head against the side of the truck or the back bumper of the truck. After the fall plaintiff arose on his hands and knees and re *590 mained in this position for about three (3) to five (5) minutes, during which time he moaned, held his head, and complained that he was having difficulty seeing. Mr. Daigrepont and a co-worker, Mr. Sam Milo, picked up Hawkins and walked him over to a pickup truck and Daigrepont took plaintiff to the office of Dr. Donald Hines.
According to plaintiff he remembers nothing from the time of the accident until he awoke on the examining table in Dr. Hines’ office. Dr. Hines reported that when he first saw plaintiff “he was supposedly unconscious; his life signs appeared normal and he seemed in no distress, as far as I could see, so I let him stay there 15 minutes while I checked other patients and when I came back there was still no change in the vital sigáis and the history that I got at that time was: he was unloading an air-conditioner and he slipped and struck his head against the truck and remembered nothing further until he woke up in the office.” (Tr. 140).
Dr. Hines’ diagnosis at that time was “a contusion or bruise of the right forehead and ice packs were prescribed and Darvon for pain and he was given some dramamine because of the complaint of dizziness.” Plaintiff was released. He walked to the drugstore, picked up his medication and then returned to the furniture store to pick up his pay check for the week’s work.
Dr. Hines next examined plaintiff on July 5, and found “slight spasms of the posterior neck muscle, however he held his head very rigidly and tended to over-exaggerate his complaints * * (Tr. 142).
Ultra sound therapy was given to plaintiff July 5th, 6th, 7th and 8th. Since plaintiff was not improving and he had so many complaints the doctor then hospitalized plaintiff and prescribed traction on July 8th. On the occasion of that admission to the hospital plaintiff then told Dr. Hines that “while unloading air-conditioner the air-conditioner slipped, struck him on head and knocked his head against truck causing injury to head and neck. Patient does not remember anything from that moment until he awoke in the doctor’s office.”
The only other evidence in the record tending to support the fact that plaintiff’s head was struck by the air-conditioner is 1) the opinion by Dr. Kirgis that he found a separation of plaintiff’s lambdoidal suture, which is hereinafter discussed, and 2) the testimony of plaintiff’s co-worker, Mr. Daigrepont, which was developed on cross examination. He testified that “the unit landed on top of him.” It is difficult to understand how plaintiff could have had his head in a position to be struck by the unit. The preponderance of the evidence supports the finding that plaintiff struck his head against the side of the truck or on the back bumper of the truck.
It is important to note that the only visible signs of injury that were apparent at the time Dr. Hines first examined plaintiff was “a bruise on the right forehead.” There were no lacerations. (Tr. 149).
Plaintiff was released from the hospital on July 13th, 1967, and was seen thereafter as an out-patient. On July 24th plaintiff had so many unaccountable complaints that Dr. Hines referred plaintiff to Dr. Paul Davis, an orthopaedic surgeon in Alexandria. It was the combined opinion of Dr. Davis and Dr. Hines that plaintiff was exaggerating his complaints; that there was no orthopaedic basis for his complaints and as of July 28th, 1968 they were of the opinion that plaintiff was fully able to return to work. Dr. Hines last examined plaintiff on August 4, 1967 and completely discharged him to return to full duty. Dr. Hines was convinced that the limitation of motion of plaintiff’s neck and the rigidity of the muscles was purely voluntary. Furthermore, Dr. Hine asked plaintiff not to use the cervical coller which plaintiff insisted on wearing. Plaintiff testified that he has worn the cervical collar from the date that it was first fitted by Dr. Hines *591 until the date of the trial. Indeed, he testified that it’s impossible for him to sleep without keeping on his cervical collar; that he cannot lie down to sleep but has had to sleep in a rocking chair. According to plaintiff that has been his situation from the date of the accident until the date of the trial.
Both Drs. Hines and Davis testified at the trial. Dr. Malen, radiologist, and Dr. Flynn, neurosurgeon, both of Baton Rouge, both testified by deposition. All of these were witnesses for the defendant.
Both Drs. Flynn and Malen were of the opinion that the x-rays of plaintiff’s neck were essentially normal. Dr. Flynn examined plaintiff on one occasion and then on February 6, 1968. He was of the opinion at that time that plaintiff was able to return to full duty. Although plaintiff constantly referred to his severe pain, Dr. Flynn was surprised to find so little in the way of objective findings. (Tr. 312.)
Dr. Flynn had the benefit of a report by Dr. Kirgis which he read prior to the examination. Since Dr. Kirgis had recommended a myelogram and since Dr. Flynn could not find any basis for plaintiff’s complaints, Dr. Flynn agreed that it would be desirable to take a myelogram. In short, it was Dr. Flynn’s opinion that he could find “no objective evidence, no objective neurological evidence of compression or irritation of any of the nerve roots or damage to the cervical spine.” (Tr. 315.) Furthermore, it was Dr. Flynn’s impression at the time of the evaluation that plaintiff could return to work. (Tr. 316.)
Plaintiff’s only physician was Dr. Homer Kirgis neurosurgeon of New Orleans, who testified by deposition that plaintiff was totally and permanently disabled. Dr. Kirgis examined plaintiff on October 12, 1967 at which time plaintiff’s chief complaint had to do with pain in his neck and in both arms. On the occasion of the examination by Dr. Kirgis there was “almost complete restriction of mobility of the head and neck.” (Tr. 237.)
The x-rays taken at Ochsner Foundation were read by Dr. Kirgis to show that “the normal cervical lordotic curve of the spine had been replaced with a kyphotic curve which was — which is a slight reversal of the normal curve and this is seen with spasm of these muscles.” (Tr. 241.) Defense counsel points out that Dr. Kirgis was unable to find a report of the radiologist who ordinarily read the x-ray film made at Ochsner’s Clinic.
Another x-ray finding by Dr. Kirgis that was not found by other physicians was that plaintiff had a separation of the lambdoidal suture. He described the lambdoidal suture as the joint or the point of union between the parietal bones and the occipital bone. The occipital bone is the large bone at the base of the skull, and the parietal bones are large bones on each side of the skull. Dr. Kirgis found no disability related to this separation but was impressed with this finding for the reason that it indicated to him that the accident caused serious injuries. Also, in this connection Dr. Kirgis was impressed by the fact that plaintiff reported that he was unconscious for a period of thirty (30) minutes following the accident.
The trial judge was not favorably impressed with plaintiff’s testimony. It is abundantly clear from the trial judge’s opinion and from the record itself that all doctors, other than Dr. Kirgis, were convinced that plaintiff was exaggerating his complaints. Dr. Kirgis accepted all complaints at face value. Apparently Dr. Kir-gis did not know that on the day of the accident plaintiff walked away from the doctor’s office and went to the drug store, picked up his prescription, and then reported to his employer to pick up his weekly pay check. Furthermore, Dr. Kirgis was impressed by the fact that plaintiff denied prior injuries to his neck. The other physicians and the trial court were apparently impressed by the' fact that plaintiff had been involved in a car accident approximately 17 years earlier which caused a rather severe scar near plaintiff’s neck, *592 and that plaintiff had two compensation claims, one in 1962 and one in 1965, both related to back injuries.
In February, 1968 defendant agreed to pay the cost of a myelogram to be taken at Ochsner Clinic. When plaintiff reported for this the record indicates that Dr. Kirgis would not administer the myelogram test unless defendant would also authorize surgery should Dr. Kirgis be of the opinion that surgery was indicated. Defendant was not willing to authorize this and the myelogram was not made.
Plaintiff-appellant stated in his brief that he does not ask a reversal of the lower court under the manifest error rule as it relates to facts. He does ask that the Court review the expert medical testimony in this case and apply it in a proper perspective, citing Malone’s Louisiana Work-mens Compensation Law and Practice, Section 252, pages 301-302:
“ * * * Expert medical opinion however, may be readily weighed from recourse to the record and since medical testimony is an important factor in determining causal relation between accident and disability, the appellate court is more likely to reach an independent decision on this question than on the question of the occurrence of an accident event.”
While we understand the fine distinction plaintiff-appellant desires that we make, we cannot find error in the trial court’s conclusion that Dr. Kirgis based his opinion on a history and an evaluation of plaintiff’s credibility that the trial court was in a better position to evaluate than was Dr. Kirgis.
On the issue of penalties and attorney’s fees, the record shows that plaintiff received his regular salary of $40.00 a week for a 5j/¿ day workweek for two weeks following the .accident. Additionally, on July 27, 1967, the company paid three (3) weeks workmen’s compensation at the rate of $26.00 per week, covering the period July 10, 1967 through July 30, 1967. As of July 30, 1967 the only physicians who had examined plaintiff, Dr. Davis and Dr. Hines, were of the opinion that plaintiff was able to resume his work. After suit was instituted on January 12, 1968, the company paid, in .addition to the other compensation benefits, the sum of $7.44 to cover back compensation benefits so as to add $2.48 per week to the first three weeks of compensation which had been paid on July 27, 1967. This revision was based on the fact that plaintiff’s $40.00 per week salary was for 5i/£ days work whereas plaintiff was entitled to be paid on a full 6 day workweek. It must be noted, however, that the employer helped plaintiff by giving him an extra two weeks’ pay at $40.00 per week.
Although defendant received a copy of Dr. Kirgis’ report of October 16, 1967, and of Dr. Flynn’s report of February 7, 1968, we affirm the trial court’s holding that the company was not arbitrary in failing to pay the .amounts awarded by the trial court before suit was filed. In short, defendant’s position that it did not owe compensation beyond August 4, 1967, while not correct, was a reasonable position. We find no manifest error.
The decision of the trial court is affirmed. Plaintiff-Appellant is to pay all costs.
Affirmed.